[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision Regarding Termination of Parental Rights
This is an action for termination of parental rights brought by the Commissioner of the Department of Children and Families (the department). The department is seeking to terminate the parental rights of Shelby B's biological parents, Dawn C. and Russell B.
I. Procedural Background
On April 28, 1998 the department filed neglect petitions and sought an order of temporary custody alleging that Shelby B was suffering from physical injury and was in immediate danger from her physical surroundings. The department further alleged that Shelby's parents could not provide the specialized need required by this fragile young child. The Superior Court for Juvenile Matters in Waterbury sustained that emergency order. On May 18, 1998, as a result of the parents' pleas of nolo contendere, that Court adjudged the child both uncared for and neglected. The Court placed the child under the protective supervision of the department. The period of supervision was extended by court order dated February 19, 9999.
On March 27, 1999 the department again sought an order of temporary custody, repeating the allegations that Shelby was suffering from physical injury and was in immediate danger from her physical surroundings. Again the department contended that Shelby's parents could not provide for specialized needs of this fragile young child. That order was also sustained. By agreement of the parties, on September 15, 1999 the Court reopened the order of protective supervision, modified the disposition and committed the child to the care and custody of the department. Shelby has been committed since that date. On April 19, 2000 the Court entered a finding that continuing efforts. to reunify the child with her parents were no longer appropriate. CT Page 7204
On June 22, 2000 the department filed a petition to terminate the parental rights of both parents. The department has alleged that both parents have failed to rehabilitate such that they could assume a responsible position in their child's life. The department further alleged that there was no ongoing parent — child relationship between the biological parents and their child. That petition was amended in September 2000 to include the allegation that both parents have abandoned Shelby.
This Court presided over a trial in this matter.[1] Based on the facts indicated below, this Court grants the termination petition on the grounds 1) these parents have failed to rehabilitate; (2) there is no ongoing parent — child relationship between parents and this child; and 3) these parents abandoned their child. Connecticut General Statutes 17a-112 (c).
II. Facts
 A. Respondent Mother, Dawn C.
Dawn C., this child's biological mother, was born in Bridgeport, Connecticut on July 28, 1970. She did not graduate from high school but did receive her high school equivalency diploma in 1990. She has two children, the youngest of whom is Shelby.
Sometime before September 1988, the date of the birth of her first child, Michael, Dawn entered into a relationship with Hector M. Dawn and Hector married in 1991. That relationship deteriorated and Dawn divorced Hector in February 1998.
Dawn met Russell in 1997. She left her husband and nine-year-old child, complaining to Russell that Hector had abused her. Shelby was born in January 1998. Dawn and Russell married the following month, shortly after Dawn's divorce from Hector. Initially the couple lived with Russell's parents in Naugatuck. They eventually secured their own apartment, after a brief stay at a local Salvation Army Shelter.
Shelby's case first came to the department's attention in April 1998. The child had been born with life threatening medical conditions. Hospital personnel were concerned that her biological parents were not attentive to Shelby's particular needs and, as a result, the child failed to thrive.[2] Additionally, there were incidents of domestic violence that impacted upon the welfare of the family.
The department was able to maintain the child with her parents through an extensive system of in-home referrals. A plethora of workers assisted CT Page 7205 Dawn in the care of her child. They included continuous visiting nurses, therapists and parental aides. The mother was seldom alone with her child. When Dawn and Russell moved to their own apartment, the all-embracing assistance remained in place.
In March 1999 Dawn and Russell's relationship was strained.[3]
Finally there was an alleged incident of domestic violence. Dawn left the Naugatuck apartment where she and Russell has resided and moved into a shelter. Because of Shelby's delicate medical condition, the shelter was inappropriate. The department was forced to secure an order of temporary custody.[4] Dawn did eventually move out of the shelter and into the home of her ex-husband Hector.
Shelby was admitted to the Connecticut Children's Medical Center, CCMC, where surgeons performed multiple procedures, including a repair of her cleft palate and a tracheostomy. The child's primary surgeon, Dr. Castiglione, noted that Dawn was not available for consultation either before or after these delicate operations. Unlike most mothers of CCMC patients, Dawn did not stay in Shelby's hospital room. Instead she visited sporadically and rarely stayed overnight. When she was at the hospital, Dawn did not care for her child. To the contrary, she remained a passive observer.
Shelby was placed in a foster home. Shortly thereafter she was adjudged neglected and committed to the custody of the department. Dawn and Russell were given specific goals to accomplish. These included evaluations, individual and family therapy and parenting classes. Dawn did not comply with the majority of these steps. She refused to attend individual counseling or parenting classes. She missed administrative case reviews. She did not keep appointments with the department.[5] She did not allow home visits, but rather insisted that any visits be at her place of employment
The most significant deficiency in Dawn's conduct was her lack of consistent, meaningful interaction with Shelby. The reason for this failure is totally attributable to Dawn.
After her hospitalization at CCMC, Shelby remained medically fragile. The department placed her in a specialized foster home. Initially Dawn visited her daughter at the department's visitation center. After a few visits at the department, the foster mother allowed both Dawn and Russell to visit Shelby at the foster home. The only requirement was that Dawn and Russell call in advance.[6]
From the beginning, Dawn did not visit regularly. When she did visit, she tended to concentrate on her own needs rather than those of Shelby. CT Page 7206 Dawn's visits came to a sudden end in September 1999. She developed a romantic relationship through the Internet. In August she suddenly left Connecticut with this new gentleman friend and began a cross-country adventure during which she attended a truck driving school in Tennessee. Rather than discuss these plans with Hector, Dawn simply abandoned him and Michael.
Dawn did not advise the department, the court or her child's foster mother that she was leaving. From September 1999 to April 2000, she did not communicate with Shelby. Although she was occasionally in Connecticut before January, she did not visit her daughter although she knew the address. She has never sent any cards, gifts or letters. She failed to participate in any administrative case reviews. She has missed the child's birthdays and each Christmas since that date.[7]
There were court ordered evaluations that assessed Dawn's abilities as a parent. Dr. Bruce Freedman concluded that Dawn was psychologically incapable of assuming that role. Stated succinctly, she neither recognized nor accepted the problems inherent in raising this child.
This Court concurs with Dr. Freedman's opinion that Dawn had trouble interacting with Shelby. There was never any close bond.[8] To the contrary, Shelby generally did her best to avoid Dawn. Furthermore, Dawn had difficulty understanding her child's limitations.[9] The absence of a mother — child bond was evident to casual observers.
During most visits with her child, Dawn often focused on her problems to the exclusion of Shelby. She insisted upon discussing her perceived troubles with anyone present. At other times, Dawn was extremely passive, allowing others to tend to Shelby's needs. Additionally, she allowed Hector to argue with Shelby's caregivers. In short, she allowed her dysfunctional parenting style to control her visits with Shelby.
Dawn had difficulty both in sustaining relationships and in handling daily affairs. As noted by Dr. Freedman, she was extremely impulsive. Dawn was prone to say or do whatever suited her at a given moment.[10]
She abandoned Shelby at a critical time in the child's life, an action reminiscent of Dawn's treatment of her oldest child. She deserted Michael for nearly two years, displaying feigned interest only after her relationship with Russell soured. This pattern would likely recur.
B. Respondent Father, Russell B.
The relationship between Dawn C. and Russell B. has already been discussed at length. When the child was a newborn. Russell was equally inattentive to Shelby's particular needs. Consequently, the child failed CT Page 7207 to thrive. Russell's association with Dawn was marked with allegations of domestic violence. Although Dawn exaggerated Russell's violent tendencies, he did have problems controlling his temper. In March 1999, Dawn left Russell permanently.
Russell's interactions with his daughter became sporadic. While his child was at CCMC, Russell seldom visited citing transportation problems and work schedule conflicts as the reasons for his inattention.
The department gave Russell specific goals to accomplish before he could permanently reunify with his daughter. These included evaluations, individual and family therapy and parenting classes. Russell completed none of these steps. He refused to attend individual counseling or parenting classes. He missed administrative case reviews. He did not maintain a stable home environment.[11] He did not have a regular source of income, choosing to rely on temporary positions or self-employment.
Shelby's foster mother allowed both Russell and his mother to visit Shelby at the foster home. Russell's mother was the more diligent of the two. Russell consistently cancelled appointments. When his mother moved from Connecticut, Russell's visits stopped entirely. He last saw Shelby on January 3, 2000. He has never sent any cards, gifts or letters. He failed to participate in any administrative case reviews. Except for one phone call in February 2000, he has missed the child's birthdays and each Christmas since his last visit.
There were court ordered evaluations that assessed Russell's parenting skills. These evaluations, and observations by the foster parents, indicate that Russell viewed his role as a father with ambivalence, at best. During his erratic visits he played well with his child, but would not accept any responsibility for the child's welfare.
Russell did not initiate any communication with the department. He had the ability to maintain telephone contact and could have used written correspondence but chose not to do either. Dr. Freedman concluded that Russell could not maintain a relationship. He could not follow through on goals. He had neither independence nor the stability of a strong viable family. Russell had enough trouble managing his own life and could not change in order to accommodate the needs of this child. He was never even willing to be a caretaker for Shelby.
C. The Child, Shelby B.
Shelby B. was born on January 1998. At the time of her birth, she suffered from a series of potentially life threatening conditions. She CT Page 7208 had a tiny jaw and tongue deformities that led to feeding and breathing problems. Additionally she suffered from a cleft palate and a severe case of Pierre-Robin syndrome. To further complicate her medical condition, Shelby had acquired a genetic condition known as Stickler's syndrome.
From the time of her birth until the date of the order of temporary custody, Shelby lived with her biological parents in Naugatuck. Her various medical impairments required that Shelby feed through a gastronomy tube and breath through a tracheostomy.
Despite the fact that her parents had the assistance of numerous aides, Shelby had problems thriving. Visiting nurses complained that Shelby's parents refused to feed her properly. They further questioned whether the child's mother ever interacted with her daughter, noting that Shelby was usually alone and in her crib when the nurses arrived, and remained so when they left the apartment.
Because of the difficulty she had both breathing and eating, doctors scheduled surgery for Shelby. Ideally the surgery should have occurred in January 1999. It was delayed because of a routine vaccination, a procedure that should not have taken precedence over surgery.
In March 1999, Dawn left the Naugatuck apartment where she and Russell had resided and moved into a shelter. Because of Shelby's delicate medical condition, the shelter, a facility that allowed smoking, was inappropriate. The department secured an order of temporary custody. During that period of temporary custody, Shelby was transported to CCMC where surgeons completed the operations that previously had been postponed.
Prior to surgery the treating physician, Dr. Castiglione attempted to meet either Dawn or Russell. Neither parent was available for pre-operative surgery consultations. They were not in the hospital when Shelby left surgery. The child was again alone when her surgeon performed his evening rounds. Her parents did not assist the hospital staff with Shelby's basic hygiene needs.[12]
Eventually Shelby was transferred to a medically appropriate foster home. Her foster mother, Donna M., was a pediatric nurse. While in the foster home, Shelby had erratic contact with her biological parents, neither of who could adhere to a regular visitation schedule.[13]
Although she had been out of her parents' care for a short period of time only, Shelby had difficulty bonding with either. She reacted to Dawn and Russell more as friendly strangers than as her biological parents and preferred the company of her foster mother. CT Page 7209
The strained relationship between Shelby and her parents is troubling. This very young child had no real connection with either biological parent. Rather than seek comfort, she avoided these individuals. This aversion was especially true with respect to Dawn. As noted by Dr. Freedman, Shelby resisted her own mother more than she did perfect strangers even though she had seen her mother regularly prior to the order to temporary custody and in a limited fashion after that date.
Shelby's adverse reaction to her mother was one of the worst ever noted by the evaluator. She cried loudly and consistently throughout the evaluation. The cries were so persistent that Shelby exhausted herself and fell asleep. For a child so accustomed to different caretakers, this visceral reaction to her own mother did not bode well for future relationships.
Shelby's connection with her foster family shows none of the conflict obvious in her relationship with her biological parents. Without exception Shelby was happy and secure in her foster family and was extremely bonded to all members of that household. Both foster parents were involved in the child's life and openly displayed deep affection.
Although at the time of the trial Shelby was thriving physically, she still needed a great deal of medical attention. Shelby's foster mother carefully monitored the child's respiration and food intake. She provided the respiration therapy needed to clear Shelby's lungs during the night.
Shelby had several conditions that required meticulous, careful and constant vigilance. Loving, caring foster parents provided this care. The child's Pierre-Robins syndrome mandated constant monitoring by caretakers and physicians. Because of her cleft palate, Shelby needed speech therapy. Additionally, her hearing was constantly tested. Strickler's syndrome could cause kidney and joint complications. None of these problems will disappear in the near future. Thus the degree of attention provided by Shelby's foster parents remains critical.
II. Adjudicatory Findings
 A. Reasonable Reunification Efforts
In order to terminate parental rights, the Department must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes CT Page 721017a-112 (c)(1). The Department does allege that these parents are unable or unwilling to benefit from such services. However in the present case no finding is necessary. At a prior hearing pursuant to Connecticut General Statutes 17a-110, there already was a finding that such efforts are not appropriate.[14] In re Deana E., 61 Conn. App. 185, 184-5, ___ A.2d ___ (2000).
B. Statutory Grounds
In order to prevail in a non-consensual termination of parental rights, the Department must establish by clear and convincing evidence that there is a statutory basis for the termination. In re Michael R.,49 Conn. App. 510, 512, 714 A.2d 1279 (1998). The facts that a court can rely upon during this adjudicatory phase are statutorily limited to events preceding either the filing of the petition or its latest amendment. Connecticut Practice Book 33-3(a).
1. Respondent Parents' Failure to Rehabilitate
In 1999 this Court adjudged Shelby neglected and entered court-ordered expectations. The department has alleged that both parents have failed to achieve the bulk of these mandated steps, and thus failed to rehabilitate.
To prevail on this basis, the department must establish that as of the date of the filing of the termination petition, the respondent parent had not achieved a requisite degree of personal rehabilitation. That level must be such as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in his or her daughter's life. Connecticut General Statutes 17a-112 (c)(3)(b). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532 (1986), see also In re JuvenileAppeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984).
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722 (1989), In reHector L., 53 Conn. App. 359, 366-367, 730 A.2d 106 (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only the parent's conduct prior to the filing of those petitions, but also conduct after that time. CT Page 7211
This Court must conclude that as of the time of this petition, Dawn had not made significant progress toward rehabilitation.
Dawn was required to participate in counseling. Rather than accept the department's assistance, Dawn contended that she was receiving therapy and counseling independently and therefore did not need state intervention. In reality, Dawn discontinued the minimal therapy she had begun at Griffin Hospital without securing any replacement.
Dawn was required to keep appointments with the department. She did not attend any of the intake interviews at the department's Family Services Visitation Center. She did not attend parenting classes. She missed administrative case reviews. After initial compliance she refused to allow the department to visit her home. In short, Dawn kept few of the necessary appointments. When she did meet with department officials, Dawn was belligerent and argumentative rather than cooperative.
Dawn was required to maintain adequate housing. During a significant portion of the relevant time period, Dawn was living a vagabond life as a track driver. This was hardly the type of stable housing her daughter required.
Dawn was required to cooperate with service providers and participate in counseling toward treatment goals. As noted earlier, Dawn aborted her treatment at Griffin Hospital when she refused to provide information needed to continue this counseling with state subsidy. She thwarted the department's efforts to reinstate that counseling. Dawn did not participate in her child's "Birth to Three" therapy sessions. This lack of effort replicated when Dawn refused to attend Waterbury Family Services or Valley Mental Health therapy sessions.
Dawn was required to visit Shelby and interact appropriately. In this regard, Dawn's failure was most significant. She began her pattern of inattention while Shelby was still at CCMC, visiting minimally. This failure to adhere to a regular schedule continued when Shelby went to her foster home. Despite liberal allowance, Dawn constantly cancelled visits, usually without notice or justification. When Dawn did visit, Shelby did not respond well. Eventually Dawn stopped visits entirely, choosing instead to pursue an agenda that required her to leave Connecticut. From September 1999 to April 2000 she had no contact with Shelby. Her only communication with. either the department or Shelby's foster family consisted of two cryptic telephone messages.
Dawn last saw her child in September 1999. Dawn's justification for her lack of attention to this child, personal conflicts and department interference, was disingenuous at best. She simply chose not to visit CT Page 7212 even when she was free to do so.[15] She has never acknowledged the child's birthday. She ignored the child at Christmas and other holiday times. She has never sent any cards, gifts or letters. She failed to participate in any administrative case reviews.
Dawn has failed to complete most of the procedures recommended by the department in its efforts to reunify this family. She has rejected therapy and counseling. She failed to maintain adequate housing and legal income. She kept neither Shelby's foster family nor the department aware of her location and was living out of the state for a large portion of the relevant time frame. In short, she has done nothing to achieve a level of competency that would encourage reunification. Her lack of rehabilitation continued even after the filing of the termination petition. This Court finally concludes that the time still required for her to fully rehabilitate and to be able to care for any child reliably is indeterminate. Indeed there is little to suggest that such rehabilitation will ever occur. The Court therefore finds, from the clear and convincing evidence, that Dawn cannot be rehabilitated as a parent of this child within the reasonably foreseeable future, consistent with Shelby's needs for permanency.
This Court also must conclude that as of the time of this petition, Russell had not made progress toward rehabilitation.
When Shelby was committed, department's goal was reunification with parents. Unfortunately, Russell has done little to accomplish this objective.
He failed to keep appointments with the department and its service providers. He did not attend administrative hearings. He failed to attend court ordered evaluations. Indeed he missed some court appearances as well. He never completed the department's anger management program.[16]
Russell did not maintain adequate housing. His housing arrangement was erratic. Sometimes he lived with various relatives. On occasion he lived out of his car.
Russell did not participate in counseling. Further he did not follow the recommendation of service providers. Part of Russell's failure in this regard was that he refused to be available for the required counseling. The department made efforts to locate him and schedule counseling and therapy, but Russell resisted all attempts. He voluntarily terminated sessions at Griffin Hospital, only to return there in June 1999 after a suicide attempt. He did not complete psychological evaluations, parenting classes or family therapy. CT Page 7213
Russell did not maintain a steady, legal income. His employment history was sporadic at best. He could not support himself. The addition of a child to this scenario would have been disastrous.
Russell did not visit Shelby as often as allowed by the department. Russell's visits were even less consistent than those of the child's biological mother. He required his own mother's assistance to attend the few visits he did keep as scheduled.[17] Unfortunately, when his mother moved from Connecticut Russell's contact with Shelby ended. He last saw Shelby in January 2000. He did not attempt to call or write the department since that time.
Russell made no attempt to maintain his relationship with Shelby. He did not change his life to accommodate the needs of this child. When he did visit, he was more a playmate than a father.
Russell has done nothing to achieve a level of competency that would encourage reunification. This Court further concludes that the time that is still required for him to fully rehabilitate and to be able to care for any child reliably is indeterminate. There is nothing to suggest that such rehabilitation will ever occur. The Court therefore finds, from the clear and convincing evidence, that Russell cannot be rehabilitated as a parent of this child within the reasonably foreseeable future, consistent with Shelby's needs for permanency.
 2. No Ongoing Parent — Child Relationship Between Respondent Parents and This Child
The department has also alleged that Shelby has no ongoing parent — child relationship with her biological parents. This is the type of relationship that would ordinarily develop as the result of a parent providing the child's daily physical, emotional, moral and educational need. The department further alleges that the time required to establish such a relationship would be detrimental to Shelby's best interests. Connecticut General Statutes 17a-112 © (3)(D). Termination on this ground is inappropriate unless "the child has no present memories or feelings for the natural parent." In re Jessica B., 217 Conn. 459,586 A.2d 597 (1991). Alternatively, the Department must establish that even if a child has memories of the parent, "no positive emotional aspects of the relationship survive." In re Jessica B.,217 Conn. at 468-70.
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Luke G.,40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985); In re Migdalia M., CT Page 72146 Conn. App. 195, 208-9, 504 A.2d 533 (1986). While the biological parents expressed an interest in maintaining a relationship with Shelby their efforts can best be described as too little too late.
The department provided testimony from a variety of witnesses. Shelby was placed in foster care at a critical stage in her medical history. She has been in her current home for nearly two years. This child has had little contact with her biological parents. None of that has been nurturing. Their interactions were more in the nature of friendly strangers rather than parents and child.
As stated by the Appellate Court, "We must conclude . . . that the phrase "feelings for the natural parent' refers to feelings of a positive nature." In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709, 483 A.2d 1101
(1984).[18] Shelby has no feelings for her biological parents. within the meaning of the statute.
Having found that there is no parent — child relationship, the court must next decide whether to allow further time to develop such a relationship. The primary consideration is the best interests of the child.
"There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman v. Lycoming County Children'sServices, 458 U.S. 502, 513 (1982). Because these parents have had no contact with their child in over a year, and contact before that was inadequate and inappropriate, to allow further time would be detrimental.
This Court concurs with the observations by Dr. Freedman. Dawn had a "tendency to focus excessively on her own feelings and needs. . . . She did not show signs of stability, adequate judgment, parenting skills, or a parent — child relationship adequate to sustain Shelby's survival." Russell had a limited ability to both set goals and then work toward them. Neither parent could sustain a lasting, nurturing relationship with Shelby.
For the foregoing reasons, the court finds by clear and convincing evidence that Shelby has no ongoing parent — child relationship with either Dawn or Russell within the meaning of the applicable statutes.
3. Abandonment
CT Page 7215
The department finally alleges that both parents abandoned their daughter. "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112 (c)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the-welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re John G., 56 Conn. App. 12, 20, 740 A.2d 496
(1999) (internal quotations omitted).
Our statutes do not contemplate a sporadic showing or the indicia of interest, concern or responsibility for the welfare of a child. To prevail, a parent must maintain, on a continuing basis, a reasonable degree of interest in the welfare of his or her child. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . . In re Kezia M.,33 Conn. App. 12, 17-18, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993)." (Internal quotation marks omitted.)
The evidence produced at trial clearly established statutory abandonment. Turning first to the child's mother, Dawn last saw her child in September 1999. She completely ignored the child until April 2000, at which point she demanded reunification.
Unfortunately, Dawn has ignored each and every one of this child's developmental needs, choosing instead to concentrate on her personal agenda. Her lack of interest and involvement is striking. There is no evidence she ever expressed love and affection for the child. She never expressed genuine concern over the health, education and general well being of the child. She never supplied necessary food, clothing, and medical care nor has she maintained an adequate domicile. There is no evidence that she ever furnished social and religious guidance. She merely visited Shelby when convenient.
Dawn has a history of abandoning her children. She left Michael for nearly two years, resuming a feigned interest only because she needed to return to Hector. That child lives with his grandparent because it is CT Page 7216 impossible for his parents to accommodate his needs. Shelby, more a plaything than a child, would be similarly situated. There is clear and convincing evidence that Dawn has abandoned this child.
Russell presents a similar situation. In essence, this Court is asked to decide whether Russell has made a "sufficient commitment to his parental responsibilities . . . whether he has done all he could reasonably do under the circumstances." Adoption of Kelsey S., 1 Cal.4th 816, 850 (1992) (emphasis in original).
 A parent's professed love is not enough. The court should consider all factors relevant to that determination. The father's conduct both before and after the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate `a willingness himself to assume full custody of the child — not merely to block adoption by others.' . . . A court should also consider the father's public acknowledgment of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child.
Matter of Raquel Marie X., 76 N.Y.2d 387, 408, 559 N.Y.S.2d 855,559 N.E.2d 419 (1990) (emphasis in original; citations omitted).
In light of all relevant facts, it is evident that Russell's effort was minimal and sporadic. Although he belatedly expressed interest, Russell never assumed parental responsibility. He never sustained reasonable, continuing concern. He never assumed parental responsibilities. Russell's attempts to lay blame on the department are unpersuasive. The department established, by clear and convincing evidence, that Russell's actions constituted abandonment.
C. Required Findings
In the second, dispositional phase of this termination of parental rights, this Court must determine whether the department has established, by clear and convincing evidence, that continuing Respondents' parental rights is not in the best interests of the child, Shelby. The Court makes the following factual findings required by Connecticut General Statutes 17a-112 (e).
CT Page 7217 (1) Appropriate and timely services were provided by the Department to the family.
These services benefited the child and her parents. Unfortunately, both parents refused to exert the effort required to take advantage of these services.
 (2) The court finds by clear and convincing evidence that the Department made reasonable efforts to reunify the family.
Both parents refused to participate in reunification efforts.
 (3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations.
The court finds that reasonable court expectations were set for both parents. Neither made any sustained effort to fulfill these basic requirements.
 (4) The feelings and emotional ties of the child with respect to her parents, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties.
Shelby has settled into her foster home. She is not attached to her biological parents, neither of who has ever been a presence in her life. Her foster family has given Shelby a safe, secure and happy environment. They are a true family unit in every sense of the word.
(5) Finding regarding the age of the child.
Shelby was born January 1998 and is three years old.
 (6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return her home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them,CT Page 7218 provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child.
As detailed above, the court finds that these parents made no effort to change their lives to accommodate the care and nurturing of this child.
 (7) Finding regarding the extent to which parents have been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent.
No such conduct is noted.
IV. Disposition
The court concludes, from the clear and convincing evidence, that there is no biological parent ready now or in the foreseeable future that will be able to care for Shelby. The court concludes, from the clear and convincing testimony, that it is in Shelby's best interests to have permanency and stability in her life. The court further finds that adoption by a family that understands and can accommodate her special needs is the avenue most likely to accomplish this result. The court also finds the testimony concerning Shelby's adoptability persuasive.
The court therefore orders that a termination of parental rights enter with respect to both biological parents. The court further orders that a permanency plan for Shelby be submitted within thirty days. A review plan for her shall be filed in accordance with state and federal law.
Julia DiCocco Dewey, Judge May 30, 2001